1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

8  ISMAEL RIVERO,                               )  1:09-cv-01414 OWW JMD (HC)
                                                )
9              Petitioner,                       )  FINDINGS AND RECOMMENDATIONS
                                                )  REGARDING PETITION FOR WRIT OF
10     v.                                        )  HABEAS CORPUS
                                                )
11  J. HARTLEY, Warden,                          )  OBJECTIONS DUE WITHIN THIRTY (30)
                                                )  DAYS
12             Respondent.                       )
13  _____     )

14
15          Ismael Rivero ("Petitioner") is a state prisoner proceeding pro se with a petition for writ of
16  habeas corpus pursuant to 28 U.S.C. § 2254.

17                              **PROCEDURAL HISTORY**

18          Petitioner is currently in the custody of the California Department of Corrections and
19  Rehabilitation pursuant to a 1987 conviction for second-degree murder with an enhancement for use
    of a firearm.  The trial court sentenced Petitioner to a term of seventeen years to life in prison.
20
21          Petitioner is not challenging his conviction in this action.  Rather, he challenges the May 12,
22  2008, denial of his parole by the California Board of Parole Hearings (the "Board").  Petitioner
    contends that the Board's denial of parole violated his constitutional rights.
23
24          Petitioner filed a petition for writ of habeas corpus with the Los Angeles County Superior
25  Court challenging the Board's decision.  The court denied the petition in a reasoned decision on
    April 7, 2009.
26
27          Petitioner also filed petitions for writ of habeas corpus with the California Court of Appeal
28  and California Supreme Court.  The appellate court denied the petition citing to In re Lawrence, 44

1  Cal. 4th 1181 (2008) and In re Shaputis, 44 Cal. 4th 1241 (2008).  The state high court summarily

2  denied the petition.

3      Petitioner filed the instant petition for writ of habeas corpus on August 13, 2009.  Respondent

4  filed an answer to the petition on February 16, 2010.

5                                      **FACTUAL BACKGROUND**

6  **I.      The Commitment Offense**

7      On November 1, 1981, Petitioner attended a Halloween party at a friend's home.  An

8  argument developed between the victim and several other male guests after the victim became angry

9  that a female guest would not dance with him.  During the altercation, Petitioner shot the victim and

10  then ran away.  The victim subsequently died from a gunshot wound to the back of the neck.

11  Petitioner was discovered five years later, on January 15, 1987, serving time in a Louisiana State

12  Prison.  (Answer Ex. 1, part b, Board of Parole Hr'gs Tr. 8, May 12, 2008, ECF No. 9 Attach. 2

13  (hereinafter "Tr.").)

14      Petitioner admits to shooting at the victim from the front, but denies firing the shot that killed

15  him.  Petitioner claims that when the altercation moved outside, his friend, Roberto, pulled a gun

16  which Petitioner took away so that Roberto would not shoot anyone.  After Petitioner had taken the

17  gun, the victim purportedly threw a bottle at Petitioner who "automatically raised [his] hand and

18  fired" at the victim's chest.  (Id. at 32.)  Petitioner then claims that he ran away and when he looked

19  back, he saw a man named Renaldo shoot the victim, who was lying face first on the ground, in the

20  back of the neck.  (Id. at 11.)

21  **II.      Pre-Conviction Facts**

22      Petitioner was born in Cuba on May 17, 1944.  He has seven brothers and sisters.  Petitioner

23  is divorced and has one daughter and three sons, all whom reside in Cuba.  (Id. at 15.)

24      Petitioner has no juvenile record.

25      Petitioner worked for several years in air conditioning before his current incarceration.

26  (Answer Ex. 3, part b, 2007 Psychological Report, 2, Nov. 26, 2007, ECF No. 9 Attach. 5, 93

27  (hereinafter "Psychological Report").)

28      After the commitment offense, Petitioner fled to Louisiana where he was arrested several

times.  On July 30, 1983, Petitioner was arrested by the New Orleans Police Department for possession of marijuana and a concealed weapon.  On November 8, 1983, Petitioner was arrested again for possession of marijuana.  On January 14, 1983, Petitioner was arrested for unauthorized use of a chemical called "moovel."  On January 29, 1983, Petitioner was arrested for possession of marijuana with intent to deal.  On March 29, 1983, Petitioner was arrested for possession of cocaine with intent to deal and for possession of a concealed weapon.  On April 28, 1983, Petitioner was taken into custody pursuant to arrest warrants for narcotics and possession of cocaine.  On January 5, 1984, Petitioner was arrested for possession of cocaine with intent to deal, possession of a controlled substance, and probation violation.  On November 7, 1984, Petitioner was received by the Haunt Correctional Facility in Saint Gabriel, Louisiana, where he was committed until January 15, 1987, when he was arrested for the instant crime.  (Tr., 13-14.)

**III.     Post-Conviction Facts**

Petitioner currently has a girlfriend, Aurelia Flores, whom he met during his incarceration in California and who comes to visit him.  (Id. at 16.)

Petitioner is currently under an INS hold and will be deported back to Cuba upon release.  (Id. at 16-17.)

The CDCR has given Petitioner a placement score of 19, which is the most favorable score an inmate at a Medium A custody level can receive.  The CDCR does not recognize Petitioner as having any gang association or enemies.  (Id. at 23.)

Petitioner earned his GED in 1996.  Petitioner has earned certifications in mill and cabinet making, auto mechanics, forklift driving, and metal fabrication.  Petitioner is currently assigned to the Prison Industry Authority metal fabrication plant.  Petitioner received several favorable letters from his supervisors.  (Id. at 24, 26-27.)

Petitioner has completed the Victims Awareness Program, fifty-four months of Narcotics Anonymous, and seventy-four months of Alcoholics Anonymous.  Petitioner has completed the following courses from the Golden Hills Adult School: coping skills, my change plan, stress and emotional well being, triggers, cravings, and avoiding relapse.  (Id. at 24.)

Petitioner has only received one CDCR-115 serious rule violation in 1999 for "over

1   familiarity with staff."  Petitioner has not received any CDCR-128 minor infractions.

2   **IV.     Post-Commitment Plans**

3         Petitioner testified that he plans on staying with Ms. Flores and working at her dry cleaning

4   business if released.  (Id. at 20.) When the Board pointed out that upon release he would have to live

5   in Cuba, Petitioner said he could live with one of his children.  (Id. at 17.)  When the Board asked

6   Petitioner what he planned to do for work in Cuba, Petitioner answered "In Cuba, I've never though

7   of that."  (Id.)

8         Two of Petitioner's sons in Cuba sent letters of support.  (Id. at 21.)  Ms. Flores sent a letter

9   of support offering Petitioner residence with her.  (Id. at 47.)  Petitioner also has a letters of support

10  from the Reverend of the Lilly of the Valley Church and from Zenida Lopez White, a friend, as well

11  as her son and son-in-law.  (Id. at 18-19.)

12  **V.     Psychological Evaluation**

13         Petitioner's most recent psychological evaluation was prepared by Dr. Reed on November

14  26, 2007.  (See Psychological Report.)

15         The report discusses two clinical instruments that are used to estimate an inmate's risk of

16  violence in prison and in community settings, the PCL-R and HCR-20.  Petitioner's PCL-R score

17  "falls within the low risk category for presence of psychopathy."  Petitioner's HCR-20 score

18  indicated a "low level of risk of violence in both the prison and community settings as compared to

19  other U.S. adult male offenders."  (Id. at 6-8.)

20         Factors that might increase Petitioner's risk of violence include (1) the age of his first violent

21  incident (thirty-seven years old); (2) his history of probation failure in 1984; (3) his "adult criminal

22  history involving numerous arrests and convictions related to the sale of narcotics and weapons

23  possession" in Louisiana; and (4) the fact that Petitioner is serving his second prison term.  (Id. at 8-

24  9.)

25         Factors that might decrease Petitioner's risk of violence include (1) the favorable scores he

26  received on the PCL-R and HCR-20; (2) lack of anti-social features and gang affiliation; (3) stable

27  childhood; (4) favorable prison programming and work history; (5) nearly total lack of prison

28  disciplinary actions; and (6) completion of his GED.  The report also found that Petitioner

1   maintained good family relations and found Petitioner's post-commitment plan to marry Ms. Flores

2   and work in her dry cleaning business, to be reasonable and viable.  (Id. at 9.)

3          The Board specifically asked Dr. Reed to expound on "the extent to which the prisoner has

4   explored the commitment offense and come to terms with the underlying causes."  (Id. at 10.)  Dr.

5   Reed provided the following answer in the report:

> [Petitioner] has successfully completed self-help therapy groups which have helped
> him gain maturity and insight into substance abuse, anger control, problem solving,
> self-esteem, and communications and other social skills.  While [Petitioner] remains
> unsure whether he actually killed the victim, he admits that he shot the victim in the
> chest.  He has demonstrated sufficient insight into the causative factors related to the
> instant offense, come to terms with the underlying causes, and is remorseful for the
> damage inflicted upon the victim of his crime.

(Id.)

10         The report concluded that Petitioner "presents with a clinically estimated low level of risk of

11  violence in both the structured prison and the community settings as compared to U.S. adult male

12  offenders."  The report did not offer any recommendations for Petitioner.  (Id.)

13  **VI    The Board's Decision**

14         The Board denied Petitioner parole for two years, finding that he would pose an unreasonable

15  risk of danger to society or threat to public safety if released from prison.  This finding was

16  predicated on (1) the commitment offense; (2) Petitioner's lack of insight into the commitment

17  offense; (3) the fact that Petitioner fled the state to avoid prosecution; (4) Petitioner's escalating

18  pattern of criminal conduct; and (5) Petitioner's lack of viable parole plans.  (Tr. 41-49.)

19         The Board found that the commitment offense was carried out in an especially cruel and

20  callous manner because the motive was trivial, the victim was unarmed, and were others present

21  during the shooting.  (Id. at 41.)  The Board was especially concerned that Petitioner maintained that

22  he did not kill the victim despite witness testimony that he fired the fatal shot and the fact that

23  Petitioner was convicted of the murder by a jury.  (Id. at 42.)  The Board also pointed out that

24  Petitioner's current version of the commitment offense contradicts previous versions.  (Id. at 43.)  At

25  the conclusion of the hearing the Board told Petitioner:

> "you just need to understand how important it is for your story to be consistent.  No
> one's asking you to admit to something you didn't do, but when we hear different
> stories, versions of the crime every time you come before us, it's very difficult to
> believe you.  And the facts as they're written in the coroner's report, the autopsy, do

1   not coincide with your version of what happened."

2        (Id. at 48-49.)

3        The Board found that Petitioner did not have viable parole plans because his letter of support

4   and offer of residence from Ms. Flores did not offer any specifications of her living situation.  The

5   Board also found that Petitioner had no clearly laid out employment plans. (Id. at 46-47.)

6        At the conclusion of the hearing, the Board recommended that Petitioner "remain disciplinary

7   free, continue in . . . self-help programs, [and] cooperate with clinicians [ ] of any future

8   evaluations."  (Id. at 48.)

9                                    **DISCUSSION**

10  **I.    Jurisdiction**

11       A person in custody pursuant to the judgment of a State court may petition a district court for

12  relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or

13  treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529

14  U.S. 362, 375 n.7 (2000); see also Sass v. California Board of Prison Terms, 461 F.3d 1123,

15  1126-1127 (9th Cir. 2006) *overruled in part on other grounds by* Hayward v. Marshall, 603 F.3d

16  546, 555 (9th Cir. 2010) (en banc).  Petitioner asserts that he suffered violations of his rights as

17  guaranteed by the United States Constitution and he is currently incarcerated at Avenal State Prison,

18  which is located in Kings County.  As Kings County falls within this judicial district, 28 U.S.C. §

19  84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus.  See 28

20  U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the

21  district court where the petitioner is currently in custody or the district court in which a State court

22  convicted and sentenced Petitioner if the State "contains two or more Federal judicial districts").

23  **II.    ADEPA Standard of Review**

24       On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of

25  1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's

26  enactment.  Lindh v. Murphy, 521 U.S. 320, 326-327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

27  (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *overruled on other*

28  *grounds by* Lindh, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's

1    enactment)).  The instant petition was filed in 2009 and is consequently governed by the provisions

2    of the AEDPA.  See Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Thus, the petition "may be

3    granted only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to,

4    or involved an unreasonable application of, clearly established Federal law, as determined by the

5    Supreme Court of the United States.'"  Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28

6    U.S.C. § 2254(d)(1)), *overruled in part on other grounds by* Hayward, 603 F.3d at 555; see Lockyer,

7    538 U.S. at 70-71.

8        As a threshold matter, this Court must "first decide what constitutes 'clearly established

9    Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

10   (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

11   Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

12   the time of the relevant state-court decision."  Id. (quoting Williams, 592 U.S. at 412).  "In other

13   words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

14   principles set forth by the Supreme Court at the time the state court renders its decision."  Id.

15       Finally, this Court must consider whether the state court's decision was "contrary to, or

16   involved an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72,

17   (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant

18   the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

19   question of law or if the state court decides a case differently than [the] Court has on a set of

20   materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

21   "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state

22   court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

23   applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "[A] federal

24   court may not issue the writ simply because the court concludes in its independent judgment that the

25   relevant state court decision applied clearly established federal law erroneously or incorrectly.

26   Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the

27   "unreasonable application" inquiry should ask whether the state court's application of clearly

28   established federal law was "objectively unreasonable."  Id. at 409.

1    Petitioner bears the burden of establishing that the state court's decision is contrary to, or

2  involved an unreasonable application of, United States Supreme Court precedent.  <u>Baylor v. Estelle</u>,

3  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

4  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

5  decision is objectively unreasonable.  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While

6  *only* the Supreme Court's precedents are binding on the Arizona court, and only those precedents

7  need be reasonably applied, we may look for guidance to circuit precedents"); <u>Duhaime v.</u>

8  <u>Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can

9  no longer reverse a state court decision merely because that decision conflicts with Ninth Circuit

10  precedent on a federal Constitutional issue . . . This does not mean that Ninth Circuit caselaw is

11  never relevant to a habeas case after AEDPA. Our cases may be persuasive authority for purposes of

12  determining whether a particular state court decision is an 'unreasonable application' of Supreme

13  Court law, and also may help us determine what law is 'clearly established'").  Furthermore, the

14  AEDPA requires that the Court give considerable deference to state court decisions.  The state

15  court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).  A federal habeas court is

16  bound by a state's interpretation of its own laws.  <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.

17  2002).

18  **III.    Review of Petitioner's Claims**

19    Petitioner raises five grounds for relief in his petition.  The first ground is that the Board

20  deprived Petitioner of his federal due process rights by requiring him to admit guilt in order to

21  receive parole.  Petitioner's second ground for relief is that the Board lacks "some evidence" to

22  support its finding that Petitioner poses a current risk of danger to society if released.  Petitioner's

23  third ground for relief is that he was denied his federal due process rights when the Board failed to

24  provide individualized consideration of all relevant facts.  In his fourth ground for relief, Petitioner

25  claims that the Board denied him his federal due process rights by relying on unchanging factors in

26  denying him parole.  The fifth ground for relief claims that the superior court's denial of Petitioner's

27  petition for writ of habeas corpus was objectively unreasonable, thus depriving him of due process.

28  As all five of these grounds claim due process violations, they will be discussed in a single analysis.

1    The Court analyzes a due process claim in two steps.  '[T]he first asks whether there exists a

2    liberty or property interest which has been interfered with by the State; the second examines whether

3    the procedures attendant upon that deprivation were constitutionally sufficient.'" Sass, 461 F.3d at

4    1127. The United States Constitution does not, by itself, create a protected liberty interest in a parole

5    date.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).

6    Respondent argues that Petitioner does not have a federally protected liberty interest in

7    parole.  The Ninth Circuit Court of Appeals has recognized that "[i]f there is any right to be released

8    on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from

9    substantive state law creating a right to release."  Hayward, 603 F.3d at 555.  The Ninth Circuit

10   further recognized that "[t]here is no general federal constitutional 'some evidence' requirement for

11   denial of parole, in the absence of state law creating an enforceable right to parole."  Id. at 559.  The

12   Hayward court's finding that there exists no free standing federal due process right to parole, or the

13   right to some evidence of current dangerousness, contained the consistent and continual caveat that

14   state law may in fact give rise to federal protection for those rights.  As later noted by the Ninth

15   Circuit, "state-created rights may give rise to liberty interests that may be enforced as a matter of

16   federal law."  Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (citing Wilkinson v. Austin, 545

17   U.S. 209, 221 (2005)).   The Pearson court found that, "Hayward necessarily held that compliance

18   with state requirement is mandated by federal law, specifically the Due Process Clause" as "[t]he

19   principle that state law gives rise to liberty interests that may be enforced as a matter of federal law is

20   long-established.  Id.

21   As noted by the Ninth Circuit in Hayward, the logical next question is whether California's

22   parole scheme gives rise to a liberty interest that can be enforced as a matter of federal law.  The

23   Ninth Circuit has definitively concluded that "California has created a parole system that

24   independently requires the enforcement of certain procedural and substantive rights, including the

25   right to parole absent 'some evidence' of current dangerousness."  Pearson, 606 F.3d at 611 (citing

26   Hayward, 603 F.3d at 562); see also Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010) (noting that

27   "California's 'some evidence' requirement is a component of the liberty interest created by the

28   parole system of that state").

1          Consequently, the inquiry that a federal habeas court must undertake in determining whether

2    the denial of parole comports with the requirement of federal due process is "whether the California

3    judicial decision approving the governor's [or parole board's] decision rejecting parole was an

4    'unreasonable application' of the California 'some evidence' requirement, or was 'based on an

5    unreasonable determination of the facts in light of the evidence.'" <u>Hayward</u>, 603 F.3d at 563 (quoting

6    28 U.S.C. § 2254(d)(1)-(2)) (footnotes omitted).  As the Ninth Circuit recently observed in <u>Cooke</u>:

7               Under California law, "the paramount consideration for both the Board and the
             Governor" must be "whether the inmate currently poses a threat to public safety and
8             thus may not be released on parole,"[citation], and "the facts relied upon by the Board
             or the Governor [must] support the ultimate decision that the inmate remains a threat
9             to public safety.

10   <u>Cooke</u>, 606 F.3d at 1214 (quoting <u>In re Lawrence</u>, 44 Cal.4th 1181, 1210, 1213 (2008)); <u>see also</u> Cal.

11   Code Regs. tit. 15, § 2402(a) ("[I]f in the judgment of the panel the prisoner will pose an

12   unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable

13   and denied parole).  The California Supreme Court in <u>Lawrence</u> held that, "[t]he relevant

14   determination for the Board and the Governor is, and always has been, an individualized assessment

15   of the continuing danger and risk to public safety posed by the inmate."  <u>Id.</u> at 1227 (noting that

16   "mere recitation of the circumstances of the commitment offense, absent articulation of a rational

17   nexus between those facts and current dangerousness, fails to provide the required "modicum of

18   evidence" of unsuitability").  Thus, the dispositive inquiry now before this Court is "'whether the

19   identified facts are *probative* to the central issue of *current* dangerousness when considered in light

20   of the full record before the Board or the Governor.'" <u>Cooke</u>, 606 F.3d at 1214 (quoting <u>In re</u>

21   <u>Lawrence</u>, 44 Cal.4th at 1221) (emphasis in original).

22          The initial step in applying AEDPA's standards is to "identify the state court decision that is

23   appropriate for our review."  <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where more

24   than one State court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

25   reasoned decision.  <u>Id.</u> (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991) for the presumption

26   that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

27   ground as the prior order).  Thus, a federal habeas court looks through ambiguous or unexplained

28   state court decisions to the last reasoned decision to determine whether that decision was contrary to

1   or an unreasonable application of clearly established federal law.  Bailey v. Rae, 339 F.3d 1107,

2   1112-1113 (9th Cir. 2003).  Here, the Los Angeles County Superior Court, the California Court of

3   Appeal, and the California Supreme Court all adjudicated Petitioner's claims.  As neither the

4   California Court of Appeal nor California Supreme Court issued reasoned opinions, the Court

5   "look[s] through" those courts' decisions to the last reasoned decision; namely, that of the Los

6   Angeles County Superior Court.  See Ylst v. Nunnemaker, 501 U.S. at 804.

7          *A. Superior Court's Decision*

8          The Court finds that the superior court's decision affirming the Board's denial of parole is an

9   unreasonable application of the California "some evidence" standard.

10         The superior court found that there was "some evidence" to support the Board's finding that

11  the commitment offense was especially heinous, atrocious, or cruel because "it was carried out in a

12  calculated and dispassionate matter" and "the victim was on the ground when Petitioner walked up

13  and shot him from behind, killing him."  (Answer Ex. 2, Superior Court Decision, 2, Apr. 7, 2009,

14  ECF No. 9 Attach. 3.) The court found further evidence supporting the Board's decision in that the

15  motive for the killing was trivial in relation to the offense.  (Id.)  The court also found "some

16  evidence" that "Petitioner has a history of escalating criminality."  (Answer Ex. 2, 2.)  The court

17  noted that:

18         Petitioner was not engaged in criminal behavior prior to the commitment offense,
           however, immediately after the offense Petitioner became a fugitive from the law.  He
19         fled California to Louisiana and lived under an assumed name.  Under this name,
           Petitioner was arrested and subsequently put on probation, for a number of drug
20         charges.  In 1984, Petitioner was jailed for a drug conviction in Louisiana which led
           to his arrest for the commitment offense.
21
    (Id.)
22
23         Immutable factors such as the commitment offense or a petitioner's criminal history can only

24  be the basis for denial of parole if those facts "support the ultimate conclusion that inmate *continues*

    to pose an unreasonable risk to public safety."  In re Lawrence, 44 Cal. 4th at 1221 (emphasis in
25
    original).  Here, the Court finds no evidence that the commitment offense, Petitioner's flight to
26
    Louisiana, or his criminal history support a finding of current dangerousness.  The superior court
27
    cited to In re Shaputis, 44 Cal. 4th 1241, 1260 (2008), in noting that "[a]n inmate's lack of remorse
28

1    or insight into the nature and magnitude of his offense may be some evidence that he currently poses

2    an unreasonable risk of danger to society."  This case, however, is not analogous to Shaputis, in

3    which the court found that the commitment offense continued to constitute some evidence of current

4    dangerousness where: (1) "the murder was the culmination of many years of petitioner's violent and

5    brutalizing behavior toward the victim, his children, and his previous wife;" (2) Petitioner

6    maintained that the shooting was an accident in the face of evidence showing it was intentional; (3)

7    Petitioner's history of domestic abuse; and (4) Petitioner's "recent psychological reports reflecting

8    that his character remains unchanged and that he is unable to gain insight into his antisocial behavior

9    despite years of therapy" and programming.  Id. at 1259-60.

10        In the instant case, Petitioner committed his first violent offense, the commitment offense,

11   when he was thirty-seven years old and has no history of violent behavior since.  Also, unlike in

12   Shaputis, Petitioner's psychological evaluation is extremely favorable and reports him as being

13   remorseful, having insight into the crime, and not engaging in anti-social behavior.  Petitioner's case

14   has none of the troubling characteristics that made the commitment offense probative of current

15   dangerousness in Shaputis.

16        The fact that Petitioner maintains that he did not fire the shot that killed the victim is not

17   "some evidence" of current dangerousness.  Petitioner argues that the Board's fixation on his

18   unwillingness to admit to actually killing the victim is prohibited by California law.  The Board

19   "shall not require an admission of guilt to any crime for which the prisoner was committed" in

20   granting parole.  Cal. Code Regs. tit.15, § 2236.  However, the Board is not precluded from

21   "weighing a convicted murderer's lack of insight."  Ochoa v. Marshall, 2009 WL 86563 at *8 (C.D.

22   Cal., Jan. 13, 2009) (citing Lopez v. Kane, 2007 WL 1232053 (N.D. Cal. Apr. 62, 2007)).  While the

23   Board specified that it was not requiring Petitioner to admit that he shot the victim in the back of the

24   neck, the Court is at a loss as to what other information the Board could be looking for to show

25   Petitioner's insight into the crime.  Petitioner testified that he understood why he was in jail and he

26   admitted to intentionally shooting the victim in the chest. He declared his remorse for his actions and

27   realized the harm he cause to the victim's family by his act.  The mere fact that there is disagreement

28   over who actually killed the victim is not evidence of current dangerousness when Petitioner readily

1   takes responsibility for shooting the victim with the intent to kill.

2          The Board went so far as to specifically request that the psychological report address "the

3   extent to which the prisoner has explored the commitment offense and come to terms with the

4   underlying causes."  In answering this inquiry, the psychological report took into account Petitioner's

5   insistence that he did not fire the fatal shot, yet still reported extremely favorable findings with

6   regard to Petitioner's insight and remorse.  In light of such a specific finding by the psychological

7   report that Petitioner had gained insight into his crime and was remorseful, the Court finds it

8   unreasonable for the superior court to find that "some evidence" supported the Board's finding that

9   Petitioner lacked insight and remorse.   The Court finds no evidence to support a finding that

10  Petitioner lacks insight into his crime or that his refusal to admit that his shot killed the victim is

11  probative of current dangerousness.

12         The Board cannot rely on Petitioner's criminal history and the fact that he fled the state after

13  the commission of the commitment offense because both factors are immutable and unchangeable.

14  See Lawrence, 44 Cal. 4th at 1227.  California Code of Regulations, section 2402 sets forth that one

15  factor tending to show unsuitability for parole is an inmate's previous record of violence, Cal. Code.

16  Regs., tit. 15, § 2402(c)(2), but there is no such record here.  Petitioner's criminal history is primarily

17  drug related and there is no evidence that, aside from the commitment offense, he has ever

18  perpetrated violence against another person.  Furthermore, Petitioner had no criminal history prior to

19  the commitment offense.  Thus, the only record of violence in Petitioner's history is the commitment

20  offense on which the Board cannot rely to deny parole.  See Lawrence, 44 Cal. 4th at 1227.

21         The Court finds no evidence of current dangerousness in the commitment offense, in

22  Petitioner's criminal history, or in Petitioner's alleged lack of insight into the commitment offense.

23  As there is no evidence to support the conclusion that Petitioner poses a current risk of danger to

24  society, the superior court's decision is an unreasonable application of the California "some

25  evidence" standard.

26  //

27  //

28

1       *B.  The Board's Decision*

2           A finding that the State court's decision was objectively unreasonable does not end a federal

3   habeas court's inquiry.  See Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008) (citing 28 U.S.C. §

4   2241(c)(3) in noting that a federal habeas court's finding that state court's decision is contrary to

5   established federal law does not end that court's inquiry).  A federal habeas court's "power to grant

6   the writ of habeas corpus to a state inmate depends on his actually being 'in custody in violation of

7   the Constitution or laws ... of the United States.'"  Id.  Thus, Petitioner is only entitled to habeas

8   corpus relief if his due process rights were violated by the lack of evidence to support the Board's

9   denial of parole.

10          As set forth in the factual background, the Board's denial was predicated on (1) the

11  commitment offense; (2) Petitioner's lack of insight into the commitment offense; (3) the fact that

12  Petitioner fled the state to avoid prosecution; (4) Petitioner's escalating pattern of criminal conduct;

13  and (5) Petitioner's lack of viable parole plans.  As discussed above, the Court finds that there is no

14  evidence to support a finding of current dangerousness based on the commitment offense,

15  Petitioner's lack of insight, the fact that he fled prosecution, or Petitioner's escalating pattern of

16  criminal conduct.

17          The Court finds that Petitioner's lack of viable Parole plans is not probative of current

18  dangerousness.  Initially, the Court agrees that Petitioner has not presented the Board with firm

19  parole plans.  Petitioner asserts that he plans to live with Ms. Flores and work at her dry cleaning

20  business; which is unreasonable in light of the INS hold on him.  Petitioner does not seem to

21  understand that he will be deported to Cuba upon release.  When asked what he plans to do for work

22  in Cuba, Petitioner admitted that he had "never thought of that."  While Petitioner does not seem to

23  have any solid parole plans, this in itself does not evidence current dangerousness.  Petitioner has

24  letters of support from two of his sons living in Cuba, with whom he can reside.  The record shows

25  that Petitioner developed marketable skills while in prison such as mill and cabinet making, auto

26  mechanics, forklift driving, and metal fabrication.  Also, Petitioner worked in air conditioning before

27  he went to prison.  The Court can find no evidence in the record that Petitioner's lack of viable

28

1   parole plans constitutes "some evidence" that he poses a current risk of danger to society.

2       The Court finds that the Board violated Petitioner's constitutional due process rights by

3   denying him parole.  After an exhaustive review of the record, the Court can find no evidence on

4   which the Board could have reasonably relied on finding that Petitioner poses a current risk of

5   danger to society.

6                                        **CONCLUSION**

7       For the foregoing reasons, Petitioner's petition for writ of habeas corpus should be

8   GRANTED.

9                                         **REMEDY**

10      Petitioner asks that the Court direct the Board to find him suitable for parole unless, within

11  thirty days of the finality of this decision, the Board holds a hearing and determines that new

12  evidence of Petitioner's conduct in prison subsequent to his 2008 parole hearing supports a

13  determination he currently poses an unreasonable risk of danger to society if released.  (Pet. at 45.)

14      The Court may order Petitioner's release and Petitioner may receive credit towards his parole

15  period.  The Ninth Circuit has held that, "[f]ederal courts have the latitude to resolve a habeas corpus

16  petition as law and justice require.' [Citation]  Ordering the release of a prisoner is well within the

17  range of remedies available to federal habeas courts."  Pirtle v. Cal. Bd. of Prison Terms, 611 F.3d

18  1015, 1025 (9th Cir. 2010) (quoting 28 U.S.C. § 2243); see also Burnett v. Lampert, 432 F.3d 996,

19  999 (9th Cir. 2005) (stating that federal courts "have a fair amount of flexibility in fashioning

20  specific habeas relief"); Sanders v. Ratelle, 21 F.3d 1446, 1461 (9th Cir. 1994) (noting that federal

21  habeas court is vested with the largest power to control and direct the form of judgment to be

22  entered); Milot v. Haws, 628 F. Supp. 2d 1152, 1156 (C.D. Cal. 2009) (quoting Hilton v. Braunskill,

23  481 U.S. 770, 775 (1987)("[F]ederal habeas courts have 'broad discretion in conditioning a judgment

24  granting habeas relief' and in 'dispos[ing] of habeas corpus matters 'as law and justice require'").

25  Furthermore, as noted by the California Court of Appeal where "the prisoner was not lawfully in

26  custody during the nine years following his original parole date because the rescission of that date

27  was not supported by 'some evidence.' [citation] *The prisoner was therefore entitled to a credit of*

28

*this unlawful custody time against his three-year parole period*." <u>In re Bush</u>, 161 Cal. App. 4th 133, 144-45 (2008) (emphasis added).  Thus, the Court recommends that Petitioner be credited for the time he has unlawfully served; namely, the time he has served as a result of the violation of his constitutional rights.

## RECOMMENDATION

Accordingly, IT IS HEREBY RECOMMEND that:

1.    The petition for writ of habeas corpus be GRANTED;

2.    The Clerk of Court be directed to enter judgement for Petitioner;

3.    Judgment be entered granting a writ of habeas corpus as follows: The Board shall find Petitioner suitable for parole at a hearing to be held within thirty (30) days of the order adopting this decision, unless new evidence of his conduct in prison or change in mental status subsequent to the May 2008 parole hearing is introduced and is sufficient to support a finding that Petitioner currently poses an unreasonable risk of danger to society if released on parole.  In the absence of any such new evidence showing Petitioner's current dangerousness, the Board shall calculate a prison term and release date for Petitioner in accordance with California law.  Further, if the release date already has passed, Respondent shall, within ten (10) days of the Board's hearing, release Petitioner from custody.  With respect to his presumptive period of parole, Petitioner is to be credited for any time that has lapsed since the release date calculated by the Board or when a finding of suitability at the November 2006 parole consideration hearing would have become final pursuant to California Penal Code sections 3041(b) and 3041.2(a)), whichever is later.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to

Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:** __**September 14, 2010**__    _____**/s/ John M. Dixon**_____
                                         UNITED STATES MAGISTRATE JUDGE